UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

DR. JAMES E. GILBERT,

    Plaintiff,

v.

CENTERS FOR ADVANCED
ORTHOPAEDICS, LLC,

    Defendant.

Civil Action No. TDC-22-1501

**MEMORANDUM OPINION**

Plaintiff Dr. James E. Gilbert, a former member of Defendant Centers for Advanced Orthopaedics, LLC ("CAO") in Bethesda, Maryland, has filed this civil action alleging retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h) (2018), a failure to pay earned wages in violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Labor & Empl. §§ 3–501 to 3–509 (West 2017), and a breach of contract. CAO has filed a Motion to Compel Arbitration or, in the Alternative, to Dismiss for Failure to State a Claim, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion to Compel Arbitration will be DENIED, and the Motion to Dismiss will be GRANTED.

**BACKGROUND**

CAO, a limited liability company based in Bethesda, Maryland, is a federation of orthopedic surgery practices in the Washington, D.C. metropolitan area. Within CAO, orthopedic surgery practices have formed divisions which pool their revenue and operate under a single taxpayer identification number.

In 2013, Dr. Gilbert's orthopedic surgery practice, Metro Orthopedics and Sports Therapy ("MOST") of Silver Spring, Maryland, joined CAO as its MOST Division. At this time, Dr. Gilbert and another physician, Dr. Phil Omohundro, co-owned MOST. In order to join CAO, Dr. Gilbert executed a professional services agreement with CAO.

In 2015, Dr. Gilbert became concerned that one of CAO's revenue sharing arrangements violated the "Physician Self-Referral Law, 42 U.S.C. § 1395nn." Compl. ¶ 11, ECF No. 1. Specifically, Dr. Gilbert alleges that although the Physician Self-Referral Law requires CAO to pool revenue from physical therapy services and distribute it evenly amongst all CAO divisions, CAO's revenue from physical therapy services was distributed amongst only the CAO divisions providing physical therapy services. Dr. Gilbert reported his concern to CAO's Board of Directors. In response, and to comply with the Physician Self-Referral Law, the Board of Directors created "unique accounting pods for the purpose of assigning particular physicians to those pods to distribute net income arising from designated health services attributable to particular physicians" and amended its operating agreement to provide for this model. *Id.* ¶ 12. According to Dr. Gilbert, federal regulations permit the creation of such pods, and when five or more physicians are organized into such a pod, they may choose how to distribute revenue, including by distributing physical therapy revenue only to physical therapy providers. However, Dr. Gilbert alleges that, in practice, CAO never implemented this pod arrangement, so CAO's revenue sharing arrangement continued to violate the Physician Self-Referral Law.

In 2017, Dr. Omohundro left the MOST Division and was replaced in 2018 by Dr. Eric Guidi and Dr. Tariq Nayfeh. In January 2019, Dr. Gilbert, Dr. Guidi, and Dr. Nayfeh executed a new Professional Services Agreement with CAO (the "PSA"). The PSA includes the following provision relating to the arbitration of disputes:

2

> The parties hereto agree that, unless [CAO] otherwise elects, any and all claims, disputes, or controversies arising out of or related to this Agreement, or the breach or threatened breach thereof, shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association as then in existence . . . Arbitration in accordance with this Section 19 is intended to be the exclusive means of resolution of any dispute or disagreement or controversy arising in connection with this Agreement and/or the relationship of the parties hereto. Notwithstanding the foregoing, this Section 19 shall not inhibit or limit [CAO's] ability to seek equitable relief on behalf of the MOST Division or otherwise with respect to a Division Member's breach or threatened breach of any of the Restrictions, as described in Section 18 hereof.

PSA Ex. A § 19, Mot. Ex. 1, ECF No. 15-2.

In or about June 2019, Dr. Gilbert again raised concerns about compliance with the Physician Self-Referral Law with Nicholas Grosso, the President of CAO's Board of Directors, and Lou Levitt, the Vice President of the Board. In approximately July 2019, CAO convened for the first time in its history a disciplinary committee to investigate "whether CAO's MOST division members' personal conduct or management warranted disciplinary action." Compl. ¶ 15.

On November 4, 2019, the MOST Division members were scheduled to appear before the disciplinary committee. That day, Dr. Gilbert and Dr. Nayfeh informed CAO about personal misconduct by Dr. Guidi, announced that they were terminating Dr. Guidi's membership for cause, and stated that they would also be leaving CAO. On December 3, 2019, Dr. Gilbert informed CAO in writing that the members of the MOST Division would be leaving CAO on or about May 1, 2020, thus triggering an unwinding provision in CAO's operating agreement.

In January 2020, CAO informed Dr. Gilbert and Dr. Nayfeh that they owed overhead expenses and outstanding loan obligations that exceeded the total amount of their outstanding accounts receivable. According to Dr. Gilbert, this claim was false. Nevertheless, CAO then "took control" of the MOST Division's accounts receivable. *Id.* ¶ 19. Dr. Gilbert alleges that CAO then failed to pay him his "standard draw and living wages" for the period from November 2019 until

3

May 2020, with the exception of two checks totaling $62,000. *Id.* ¶ 20. Dr. Gilbert also alleges that, between November 2019 and May 2020, CAO diverted over $2 million from the MOST Division and ignored multiple requests for an "accurate accounting." *Id.* ¶ 21.

On March 31, 2020, CAO circulated an electronic ballot to its Class A shareholders through which it requested that the shareholders vote to terminate the CAO memberships of Dr. Gilbert and Dr. Nayfeh and to dissolve the MOST Division, effective May 1, 2020. The proposal, however, was not approved by the required two-thirds of the shareholders. On May 1, 2020, the MOST Division members, Dr. Gilbert and Dr. Nayfeh, officially withdrew from CAO. Dr. Gilbert alleges that, upon their departure, CAO failed to release to them approximately $2 million of MOST's accounts receivable. Dr. Gilbert further alleges that CAO continued to "convert" the MOST Division's accounts receivable after the departure. *Id.* ¶ 23. Furthermore, Dr. Gilbert asserts that where the MOST Division did not have billing software or a patient recordkeeping system independent of CAO, CAO deprived Dr. Gilbert and Dr. Nayfeh of their patient records, in violation of the unwinding agreement.

On June 20, 2022, Dr. Gilbert filed the Complaint in the present case. In the Complaint, Dr. Gilbert alleges (1) in Count 1, that CAO engaged in retaliation against him for raising concerns about noncompliance with the Physician Self-Referral Law, in violation of the FCA; (2) in Count 2, that CAO failed to pay him earned wages, in violation of the MWPCL; and (3) in Count 3, that CAO engaged in a breach of contract under Maryland law, specifically by taking control of the MOST Division's accounts, failing to pay him certain revenue including his share of the outstanding accounts receivable, and withholding his patient records.

## DISCUSSION

In its Motion to Compel Arbitration or, in the Alternative, to Dismiss for Failure to State a Claim, CAO seeks an order to send this case to binding arbitration. In the alternative, CAO seeks dismissal of Counts 1 and 2 on the grounds that the Complaint fails to state plausible claims of violations of the FCA or the MWPCL.

### I. Motion to Compel Arbitration

CAO primarily asserts that this dispute is subject to arbitration pursuant to the arbitration clause in the PSA signed by Dr. Gilbert. In opposing arbitration, Dr. Gilbert argues that the arbitration clause is inapplicable because it is not mutually binding and therefore lacks consideration.

#### A. Legal Standard

A request to compel arbitration is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16 (2018), which provides that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*Id.* § 2. Thus, a litigant in federal court may compel arbitration under the FAA upon a demonstration of: (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision that purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of the other party to arbitrate the dispute. *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991).

Here, Dr. Gilbert disputes only the second of these elements, arguing that there is no valid agreement to arbitrate his claims against CAO. In deciding whether such a valid arbitration agreement exists between the parties, the Court applies ordinary state law principles governing the formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Accordingly, Maryland law applies here. *Id.*

### B.  Consideration

Although Dr. Gilbert does not dispute the existence of an arbitration clause in a contract he signed with CAO, he argues that the arbitration clause is not a binding agreement because CAO was not bound by its terms, such that there was no consideration as required to establish a binding contract.

Agreements to arbitrate may be invalidated "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "To be binding and enforceable, contracts ordinarily require consideration" which, in Maryland, "may be established by showing a benefit to the promisor or a detriment to the promisee." *Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d 656, 661 (Md. 2003) (citations omitted). Consideration may take the form of "[f]orbearance to exercise a right or pursue a claim." *Id.* "A promise becomes consideration for another promise only when it constitutes a binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement." *Id.*

In *Cheek*, the Court of Appeals of Maryland held that in determining whether there is adequate consideration for an arbitration provision, a court may not rely on the consideration underlying the overall contract, but instead must find specific consideration for the agreement to arbitrate itself. *Id.* at 667. This rule is based on the fact that, under Maryland law, an arbitration clause is "an independently enforceable contract" that is "a severable part of the contract." *Id.* at

664–65 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967)); *see FOP Lodge No. 4 v. Balt. Cnty.*, 57 A.3d 425, 432–33 (Md. 2012); *Holmes v. Coverall N. Am., Inc.*, 649 A.2d 365, 371 (Md. 1994) ("[A]n arbitration clause is severable from the entire contract."). Such an approach prevents courts from impermissibly "'straying into the prohibited morass of the merits of the claims' by looking to the parties' obligations (and their potential breach) underlying the lawsuit itself." *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 607 (4th Cir. 2013) (quoting *Cheek*, 835 A.2d at 665). Thus, in determining the validity of an arbitration clause in a contract, the provision "must be supported by consideration independent of the contract underlying it, namely, mutual obligation." *Id.* at 609.

Here, Dr. Gilbert argues that the arbitration clause does not establish a valid contractual agreement because it does not mutually bind Dr. Gilbert and CAO to engage in arbitration. Specifically, Dr. Gilbert focuses on the language of the arbitration clause which states that "unless [CAO] otherwise elects," all claims "arising out of or related to this Agreement, or the breach or threatened breach thereof, shall be resolved by binding arbitration." PSA Ex. A § 19. Dr. Gilbert contends that because, under this language, CAO has the unlimited right to elect not to engage in arbitration, CAO is not actually bound by the agreement to arbitrate any disputes. The Court agrees that the plain language of the arbitration clause, which places no limits on CAO's right to elect not to engage in arbitration, lacks consideration and thus is not enforceable.

CAO argues that the language allowing CAO to elect not to arbitrate is meant to account for other provisions in the PSA that provide for other means of dispute resolution, including Section 18 of the PSA, which contains a non-competition clause providing that CAO is entitled to obtain a temporary restraining order, a preliminary injunction, and/or a permanent injunction against Dr. Gilbert for any violation of the non-competition clause. This argument is unpersuasive

7

for two reasons. First, the "unless [CAO] otherwise elects" language is in no way limited to this or other scenarios addressed in the PSA. Had the parties intended to impose such a limitation, the clause could have been drafted to do so. Second, the arbitration clause actually contains, in its last sentence, a written exception to the arbitration requirement for claims arising out of Section 18 of the PSA. The PSA reads, in relevant part, "Notwithstanding the foregoing, this Section 19 shall not inhibit [CAO's] ability to seek equitable relief on behalf of the MOST Division or otherwise with respect to a Division Member's breach or threatened breach of any of the Restrictions, as described in Section 18 hereof." *Id.* Where this issue is specifically addressed by this language, the claim that the "unless [CAO] otherwise elects" is intended to apply only to claims arising under Section 18 or similar sections is untenable.

Because the "otherwise elects" language plainly provides CAO uncabined discretion to opt out of arbitration, the Court finds that the arbitration clause does not mutually bind CAO and Dr. Gilbert and thus lacks consideration. *See Cheek*, 835 A.2d at 658, 669 (finding unenforceable for lack of consideration an arbitration clause that read that the employer "reserves the right to alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice"); *Noohi*, 708 F.3d at 610–11 (finding that an arbitration agreement was unenforceable where it applied only to the buyer in the transaction and not the seller); *Raglani v. Ripken Professional Baseball*, 939 F. Supp. 2d 517, 520, 522–23 (D. Md. 2013) (finding unenforceable an arbitration agreement that applied only to employees and not their employer). The arbitration clause is thus not enforceable, and the Motion to Compel Arbitration will be denied.

**II.    Motion to Dismiss**

In the alternative, CAO asserts that even if this case is not subject to arbitration, the Court should dismiss Counts 1 and 2 of the Complaint pursuant to Federal Rule of Civil Procedure

12(b)(6) on the following grounds: (1) Dr. Gilbert is not an employee, agent, or independent contractor covered by the FCA; (2) Dr. Gilbert did not engage in protected activity within the meaning of the FCA; and (3) Dr. Gilbert is not an employee covered by the MWPCL.

### A.     Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Courts are permitted to consider a document attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). With the Motion, CAO has submitted two exhibits: (1) the PSA signed by Dr. Gilbert, which includes the Division Operating Terms for the MOST Division; and (2) the CAO Limited Liability Company Operating Agreement ("the LLC Operating Agreement"), the agreement governing the relationship between CAO and its members, including the members of the MOST Division. Where Dr. Gilbert has asserted a breach of contract

9

claim based on an alleged breaches of the PSA and the LLC Operating Agreement, the Court will consider these contracts as documents integral to the Complaint for purposes of the Motion.

### B.     FCA Retaliation Claim

In Count 1, Dr. Gilbert alleges that CAO violated the FCA by retaliating against him for raising concerns about whether CAO was violating the Physician Self-Referral Law. The FCA imposes civil liability for submitting false claims to the United States government, including against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1). A "claim" includes "any request or demand, whether under a contract or otherwise, for money or property" that "is presented to an officer, employee, or agent of the United States." *Id.* § 3729(b)(2). The FCA's provision barring retaliation states that:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

*Id.* § 3730(h)(1). To state a plausible FCA retaliation claim under § 3730(h), a plaintiff must allege facts sufficient to support a reasonable inference that: (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer knew about the protected activity; and (3) the employer took adverse action against the plaintiff as a result. *See United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018). Here, the parties dispute whether the allegations support the claims that Dr. Gilbert is an "employer, contractor, or agent" covered by the FCA and that he engaged in protected activity within the meaning of the FCA. 31 U.S.C. § 3730(h)(1).

### 1. Employee, Contractor, or Agent

The FCA retaliation provision protects only employees, agents, or independent contractors. *Id.* CAO argues that the FCA retaliation claim should be dismissed because Dr. Gilbert was not an employee, contractor, or agent of CAO and was instead a member of CAO, a limited liability company ("the LLC").

Here, although Dr. Gilbert was a member of the LLC, CAO and Dr. Gilbert also entered into the PSA, a contract governing the specific work he performed. Indeed, the PSA specifically states that it governs the "professional medical services" performed by Dr. Gilbert on behalf of CAO. PSA Ex. A at 1. The PSA, through its incorporated Division Operating Terms, sets forth terms for Dr. Gilbert's medical work, including requiring him to provide medical services and to be on call at certain times, and it establishes the terms of his compensation and vacation leave and requirements to maintain hospital privileges and insurance. The PSA thus constitutes a relatively standard professional services contractual arrangement for a physician to provide medical services.

In *Vessell v. DPS Associates of Charleston, Inc.*, 148 F.3d 407, 412 (4th Cir. 1998), the court held that an individual who provided landscaping services to a realty company was a contractor for purposes of the FCA, rather than an employee, based on a consideration of factors including the hiring party's right to control the manner and means by which the work was performed, the skill required, the source of the instrumentalities and tools used to conduct the work, the location of the work, the duration of the relationship between the parties, whether the hiring party has the right to assign additional projects to the hired party, the extent of the hired party's discretion over when and how long to work, the method of payment, and the hired party's role in hiring and paying assistants. *Id.* (holding that the plaintiff was an independent contractor who was not covered by the FCA's retaliation provision, which did not cover contractors at the

11

relevant time). Although consideration of these factors may demonstrate that Dr. Gilbert acted in a sufficiently independent manner that he was not an employee of CAO, many of these factors relevant to the question of whether someone is a contractor for purposes of the FCA are addressed by the terms of the PSA, which specifies the terms and conditions under which Dr. Gilbert would provide professional medical services to CAO. Thus, even though Dr. Gilbert was a member of the LLC, he also had a separate service contract that qualified him as a "contractor" for purposes of the FCA. 31 U.S.C. § 3730(h)(1).

### 2.   Protected Activity

Even if Dr. Gilbert is properly deemed to be a contractor covered by the anti-retaliation protections of the FCA, he would only have a viable FCA retaliation claim if he engaged in protected activity under that statute. As reflected in the statutory language, the FCA recognizes two types of protected activity: (1) acts "in furtherance of" an FCA action; and (2) "other efforts to stop" one or more FCA violations. *Id.* Neither form of protected activity necessarily requires the existence of a substantive FCA claim, as "retaliation can occur while employees are investigating or collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013). Nevertheless, the first prong, taking acts in furtherance of an FCA action, requires that the protected activity occurred when there was "a distinct possibility" of litigation under the FCA, or that there was conduct that "reasonably could lead to a viable FCA action," as determined from the "perspective of the facts known by the employee at the time of the protected conduct." *United States ex rel. Grant*, 912 F.3d at 200–01 (quoting *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010)). Thus, to establish such protected activity, Dr. Gilbert would have to show that the practices he complained about—distributing profits from physical therapy services only to those

divisions rendering physical therapy services—reasonably could form the basis of a viable FCA claim.

The second prong, making "other efforts to stop" an FCA violation, requires facts sufficient to support the inference that a plaintiff's actions were "motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Id.* at 201. Thus, for Dr. Gilbert to allege plausibly that he engaged in protected activity under the second prong, he must advance facts that support an objectively reasonable belief that CAO was violating the FCA, that he registered his complaints based on that belief, and that his complaints "were designed to stop one or more violations of the FCA." *Id.* at 201–02. Notably, merely reporting regulatory non-compliance is insufficient to state a claim for retaliation under the FCA. *See United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 702 (4th Cir. 2014). Rather, an FCA claim requires that in relation to a claim submitted to the government, there was "a false statement or fraudulent course of conduct" that was material to the government's decision to pay the claim. *Id.*

Here, the allegations are insufficient to support either prong. Dr. Gilbert alleges that he twice told the CAO Board of Directors that he believed that CAO's profit sharing arrangement violated the Physician Self-Referral Law. However, Dr. Gilbert has failed to allege any facts demonstrating a "distinct possibility of FCA litigation" or an objectively reasonable belief that the alleged violations of the Physician Self-Referral Law resulted in, or could have resulted in, the submission of any false or fraudulent claims to the federal government. Dr. Gilbert has not shown, by reference to any specific language in the Physician Self-Referral Law or otherwise, how the particular alleged violations relating to revenue sharing would necessarily result in the submission of false or fraudulent claims to the federal government. *See* 42 U.S.C. § 1395nn. Dr. Gilbert has alleged only that he reported regulatory noncompliance to the CAO Board, without any allegations

describing how it would be reasonable to conclude that such noncompliance would result in any false or fraudulent claims. *See United States ex rel. Grant*, 912 F.3d at 202 (distinguishing concerns about regulatory noncompliance from specific allegations of fraud aimed at the Government); *cf. Young v. CHS Middle East, LLC*, 611 F. App'x 130, 133 (4th Cir. 2015) (finding that the plaintiffs engaged in protected activity under the FCA where they informed their employer's director that the employer had submitted false reports on staffing on a government contract by listing emergency medical technicians as scrub technicians for surgery even though they had no surgical experience). Because Dr. Gilbert has not alleged sufficient facts to show that he engaged in protected activity under the FCA, the Motion to Dismiss will be granted as to the FCA retaliation claim.

### C. MWPCL Claim

In the Motion, CAO also seeks dismissal of Dr. Gilbert's claim in Count 3 that CAO violated the MWPCL by failing to pay him earned wages. However, because the Court finds that the FCA claim is subject to dismissal, the remaining claims are state law claims, and the parties are both citizens of Maryland, there are no remaining claims over which the Court has original jurisdiction. Under these circumstances, the Court need not address the remaining argument for dismissal on the merits because the Court declines to exercise supplemental jurisdiction over the remaining state law claims and will dismiss them without prejudice for lack of subject matter jurisdiction. *See* 28 U.S.C. § 1367(c)(3) (2018). The statute of limitations is tolled for 30 days to permit Dr. Gilbert to refile his remaining claims in state court. *See* 28 U.S.C. § 1367(d).

## CONCLUSION

For the foregoing reasons, the Motion to Compel Arbitration or, in the Alternative, to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be denied as to the Motion to Compel Arbitration. The Motion will be granted as to the Motion to Dismiss. A separate Order shall issue.

Date: July 7, 2023

THEODORE D. CHUANG
United States District Judge